HAMLIN, Justice.
The Louisiana Public Service Commission et al. (Hereinafter designated as the Commission) appeals from a judgment of the trial court in favor of The Texas & Pacific Railway Company (Hereinafter designated as the Railway), which annulled and set aside Order No. 8533 of the Commission and authorized the Railway to close and discontinue the operation of its Provencal, Louisiana, Agency Station, effective March 9,- 1962.
The Commission contends that the trial court erred:
“(1) In holding that the evidence did not support the Public Service Commission’s finding that the agency at Provencal, Louisiana should not be discontinued because of the public inconvenience which would result from such action.
“(2) In holding that public convenience and necessity did not require the continued operation of the Provencal, Louisiana, agency station.
“(3) In failing to take into consideration the public convenience and necessity which requires the maintenance of the agency station at Provencal, Louisiana.”
In its application to the Commission for authorization to close and discontinue its agency station at Provencal, the Railway alleged that, “the volume of business on its entire Pleasant Hill Sub-division and at its Provencal Station handled by applicant has continually and steadily decreased from year to year and at a loss and has become such that public convenience, need and necessity do not call for, require, or warrant the continuance and maintenance of Provencal as an Agency Station and its further continuance and operation is an uneconomical and unnecessary burden on applicant who is charged with the duty and obligation of operating its business and avoid all unnecessary and wasteful operation when and where they are no longer needed, used or required by the public.”
The Commission concluded from the record that the public convenience and necessity required the continuance of the agency;[1] the trial court was of the opin *88 ion that plaintiff had discharged the burden imposed on it and had made out a case justifying the closing of its agency station.
In matters such as the instant one where there are conflicting decisions by the Commission and the district court, this Court has held that, “Under the settled jurisprudence of this court the decisions of the Louisiana Public Service Commission are accorded great weight and are not disturbed unless they are found to be clearly erroneous and unsupported by the evidence and according to the rule generally prevailing the test employed in determining whether or not a railroad may properly be entitled to discontinue an agency station, where an absolutely necessary service is not involved, is whether the public good derived from maintenance of the agency station outweighs the expense to the railroad in continuing such agency. In determining such matters consideration should be given to the volume of business done at the station, its proximity to other stations, the accessibility thereof, the cost of maintaining such agency station, the financial loss, if any, to the railroad, giving due regard to the welfare of the public and the probabilities of future development.” Texas and Pacific Ry. Co. v. Louisiana Public Service Comm., 240 La. 669, 124 So.2d 902, and authorities therein cited. See, Louisiana & Ark. Ry. Co. v. Louisiana Public Service Comm., 240 La. 658, 124 So.2d 899; Texas & New Orleans R. R. Co. v. Louisiana Pub. Serv. Comm., 242 La. 191, 135 So.2d 268.
In Louisiana & Ark. Ry. Co. v. Louisiana Public Service Comm., 242 La. 67, 134 So.2d 551, we said that the fact that the subject station is being operated at a loss does not of itself justify its' discontinuance, though it is one of the factors to be considered; we also stated that if the findings and conclusions of the Commission are not supported by the evidence and do not conform to the law, the Commission’s order is unreasonable and should be annulled by this Court. See, Missouri Pacific R. Co. v. Louisiana Public Serv. Comm., 241 La. 242, 128 So.2d 644.
The following facts of record are to be-analyzed with the foregoing enunciated law in mind.
Provencal, a small incorporated community with an approximate population of 600 to 800 people, is located at the junction of Louisiana State Highways 120 and 117 (hard-surfaced or black-topped roads) im Natchitoches Parish on the Pleasant Hill Sub-division — a branch line of the Railway extending from Shreveport to Cypress, Louisiana, via South Mansfield, Louisiana-Provencal is approximately 13% miles-southwest of Natchitoches, Louisiana, by highway and 22.4 miles by rail, via Cypress it is approximately 7 miles by rail from' Robeline, Louisiana, and approximately 10.2 miles by highway; both Robeline and! Natchitoches are open agencies of the Railway, having agents on duty.
The Town of Provencal has a number of general stores, several piling contractors, and a canning center; its economy is primarily dependent upon saw mills and forest products. The freight handled by the Railway is primarily outbound and consists of ties, pulpwood, and pine poles; the inbound freight consists principally of animal and poultry feed, gravel, and limestone.
Mr. S. L. Wright of New Orleans, Executive Representative of the Railway having jurisdiction over the various departments in Louisiana, testified that if the station at Provencal were closed the business-would be handled by the agent at Robeline,, who is on the same telephone exchange as Provencal; he said that if tolls were charged, the Railway would pay any toll any time of the day between Provencal and Robeline and between Provencal and Natchitoches. Mr. Wright stated that the future accounting would be done by the agent at Robeline, and that the L.C.L. would be handled in exactly the same manner as before with store-door delivery by *89 truck; that there was no passenger train service through Robeline or Provencal, and that “the existing freight service, local, is maintained eastward on Mondays, Wednesdays and Fridays and westward ■on Tuesdays, Thursdays and Saturdays. He spots the cars going down one day and picks up and comes back the next day and spots the empties and picks up going westward, and he will continue to do so exactly .as he is operating today.”
With respect to the operations at Provencal and its alleged loss, Mr. Wright testified as follows:
“During the month or the year 1960 at Provencal they shipped 374 carloads of pulpwood, pine poles and ties and other forest products. The gross revenue was $27,357.33 and during that same period they had outbound T.P. and T.P.-M.P. Motor billing, L.C.L., in the amount of $2.55, making a gross revenue of $27,359.88 outbound during the entire year of 1960.
“Inbound during the year 1960 we bad 13 carloads made up of two limestone, eight gravel and three animal and poultry feed with a gross revenue ■of $606.55.
“During the year 1960 we had inbound L.C.L. — carload in the amount of $310.45, which is a little less than $1 a day total inbound and outbound revenue for our trucks, and as you can see on the map we make that trip down there every day off of the cut-off to Provencal. If there’s not anything— I say every day — if they didn’t have anything going down there that day we wouldn’t go and you wouldn’t want us to go, but every day that there is something we go down to Provencal.
“ * * * gave us a total of 393 cars handled during the entire year, which is just a little over one car a day, * * * It gave us a gross revenue of $28,180.39, $313.00 total L.C.L., making a total revenue of $28,493.39. The passenger revenue was none because we don’t operate any trains and the miscellaneous revenue was $141.76 made up of $136.00 demurrage and $5.76 C.O.D.
“ * * * The total revenue was $28,635.15.
“Now, every station — you must have an inbound and an outbound station and therefore we have to divide the revenue in half and that gives us a revenue assignable to Provencal of $14,246.70 or a total revenue assignable to Provencal of $14,388.45.” [2]
Applying an 85.25% ratio, Mr. Wright said that the cost of handling traffic at Provencal, excluding station expenses, was $12,145.31; to this figure he added the station expenses of $5,649.30 and arrived at a total expense of $17,794.61. He said that the agency station therefore suffered an out-of-pocket loss of $3,406.16 for the year 1960. ($17,794.61-$14,388.45.)
With respect to the first six months of 1961 (the present hearing was held before the Commission on September 14, 1961), Mr. Wright testified that, “The gross for the first six months inbound and outbound was 25 cars for six months and the total revenue was $2,646.71. Passenger revenue was none and miscellaneous revenue none, making a total revenue of $2,646.71, less revenue assignable to either origin or destination station Yz of total * * * gives us $1,323.21 * * * ”; and that the expenses were $2,760.36, which exceeded the total revenue, inbound and outbound.
Mr. Wright said that his company was earning less than one-half of 1% on its capital investment; that the company stock was selling for $76.00 a share, whereas the book value was $365.00. He estimated that the Railway would save approximately $6,-000.00 a year by closing the Provencal station.
*90 With respect to potential shipments from the Kisatchie National Forest, Mr. Wright said that he could neither anticipate future business nor the likelihood of shipments by rail. He gauged the distance to Kisatchie National Forest as approximately IS — 17 miles from Provencal and about 21 miles from Robeline.
Mr. Harry M. Voigt, Marshall and Tax Collector and also Mail Carrier for Provencal, testified in opposition to the station’s closing. He stated that he received no deliveries other than appliances, and that he received no shipments in his official capacity. When questioned with respect to the industry in the Provencal area, he mentioned a planing mill which had been in operation for one-half year and a broom handle mill which had been operating for one and one-half months; he said that they were just commencing their work. He gave an estimate of approximately four or five sawmills for the area; he was of the opinion that they had not been operating at full capacity during the past year because of bad weather and poor markets; he anticipated future markets and full production. In Mr. Voigt’s opinion, the Kisat-chie National Forest represented a potential for the area; he opined that future industrial development would be diminished by the lack of an agency station at Provencal. He said that the army employed the services of the station when army maneuvers took place at Camp Polk. He felt that the service rendered by motor freight was dependent upon deliveries rather than pick-up.
Mr. Carroll Davis, Merchant, and School Board and City Council Member from Provencal, testified:
“But we’re right at the gate-way of all this Forest down here and we don’t have any stations to the east of us, and I don’t see why they would close Provencal and make all that stuff come through Provencal and go six miles farther when we’re right in the lap of it right there.
“That’s the reason why we can’t understand it. I mean we’re right there in it and over a period of 10 years, which don’t make no difference, I understand, I believe that Provencal will stand with any town along the T. & P. Railroad with the exception of Mansfield.”
Mr. Ory Wester stated that he was in the real estate business, did a little farming, raised a few cattle, and engaged in the timber business. He stated:
“* * * we feel that there’s no doubt at all that the railroad has the correct data and we’re not trying to argue that point and the thing that we, the citizens of that community are hollering about is to give us a little time. We’re just beginning to breathe down there from the little lull that we had, and to me it was a kind of a little thing you would call a depression, but we just didn’t admit it.
“If we don’t show a little sign of kind of coming out of it within a year if they could postpone that thing, we don’t feel like we’d have much kick coming but we are beginning to breathe a little bit, and we just wish you would take that into consideration with the closing of that depot down there.”
A summation of the testimony of the witnesses opposing the station’s closing is to the effect that discontinuing the agency station is premature and that there are possibilities of future development of the area. We have held that “the probability of future increase in business due to newly developing industries in the area is insufficient to warrant the expense of maintaining an agency station. Texas and Pacific Railway Company v. Louisiana Public Service Commission, 240 La. 669, 124 So.2d 902.” Texas & Pacific Ry. Co. v. Louisiana Public Serv. Comm., 242 La. 358, 136 So.2d 385.
No evidence was offered to contradict Mr. Wright’s testimony with respect to the correctness of the accounting practices employed by the Railway as set forth in its *91 exhibits. The figures which resulted from the employment of the formula definitely showed an operating loss suffered by the Railway. The exhibits offered in evidence by plaintiff were for a short period of time (1960 and six months of 1961); counsel for the Railway stated that the time element was consonant with that employed by plaintiff in exhibits submitted at prior hearings of other matters. Additionally, counsel for plaintiff stated, “We do not take the position, either technically or legally, that the question of operating expenses, profit and loss, is the sole test. Need, demand, necessity and convenience all are involved.”
“With respect to the accounting practices of the Railroad set forth in its exhibits, this Court has held that in the absence of any evidence to the contrary we must adopt the formula of the Railroad in accounting and allocating expenses as the correct one. Texas & New Orleans Railroad Company v. Louisiana Public Service Commission, 241 La. 635, 130 So.2d 398; Illinois Central Railroad Company v. Louisiana Public Service Commission, 240 La. 769, 125 So.2d 159. * * *” Texas & Pacific Ry. Co. v. Louisiana Public Serv. Comm., 242 La. 358, 136 So.2d 385. See, Texas and N. O. R. R. Co. v. Louisiana Pub. Serv. Comm., 241 La. 635, 130 So.2d 398.
The Railway, appellee herein, has carried its burden of showing that the public convenience and necessity will not be materially affected by the closing and discontinuance of the Provencal, Louisiana, Agency Station. LSA-R.S. 45:1165. Mr. Wright’s testimony, supra, is affirmative; it was neither contradicted nor discredited. Under the circumstances of the case and an application of the jurisprudence above enunciated, we find that the immediate closing and discontinuance of the Provencal, Louisiana, Agency Station is justified.
For the reasons assigned, the judgment of the district court is affirmed.

. Two members of the Commission concurred and one member dissented.

. We have checked the exhibits and find that the figures testified to are the same as those set forth in the exhibits.